THE MINNESOTA & MANITOBA RAILROAD COMPANY v.
CASLA O. ADAMS AND OTHERS.

EMMA J. HARWOOD AND OTHERS, APPELLANTS.[1]

May 25, 1923.

No. 23,186.

Right-of-way statute does not apply to ceded portion of Red Lake Indian
    Reservation.

1.   The general laws granting railroads a right of way across public
lands do not apply to the ceded portion of the former Red Lake In-
dian Reservation as the ceded lands are impressed with a trust.

Approval of map of station grounds related back to time of filing map of
    definite location.

2.   By a special act of Congress, plaintiff was granted a right of way
across this reservation with the right to take a specified quantity of
land for station grounds for each ten miles of road.   For the purpose
of complying with the provisions of the act, plaintiff filed a map show-
ing the definite location of its road and the station grounds in contro-
versy, which map was approved December 5, 1900.   Subsequently, pur-
suant to the requirements of the department of the interior, plaintiff
filed a separate map of these station grounds which was thereafter
approved by the department.   Held that the approval of this separate
map related back to the filing of the original map and that plaintiff's
rights to the station grounds were prior and superior to the rights of
defendants initiated after the filing of the original map.

Action in the district court for Roseau county to recover $10,000
damages and possession of certain station grounds.   The case was
tried before Watts, J., who made findings and ordered judgment in
favor of plaintiff.   Defendants' motion for amended findings was de-
nied.   From an order denying their motion for a new trial, defend-
ants appealed.   Affirmed.

*Walter L. Chapin,* for appellants.
*Hector Baxter* and *W. E. Rowe,* for respondent.

[1]Reported in 194 N. W. 11.

TAYLOR, C.

Plaintiff brought this action against a large number of defendants to establish title to its station grounds at the village of Roosevelt in the southeast quarter of section 36 in township 162 north of range 35 west. Only a few of the many defendants interposed answers, and the term defendants, as used hereafter, will refer only to those who are contesting plaintiff's title. The trial court found that plaintiff is the owner and entitled to the possession of the lands in dispute, and defendants appealed from an order denying a new trial.

These station grounds are within the ceded portion of the former Red Lake Indian Reservation and consist of a strip of land 150 feet in width on each side of the railroad right of way extending across the quarter section above described. Certain of the ceded lands, including the section in which this land is situated, were not opened for settlement or entry until 1903. In 1907 a patent was issued, under the homestead laws, to Arthur J. Harwood for the west half of the southeast quarter of section 36, pursuant to a claim thereto initiated by him in November, 1903. This patent stated that it was "subject to such right of way as the Minnesota and Manitoba Railroad Company may have under the Act of April 17, 1900," and a similar notation had been made on the original homestead receipt issued to him. In the same year, 1907, a patent was issued, under the townsite laws, to Henry J. Chapin as president of the village council of the village of Roosevelt for the southeast quarter of the southeast quarter of section 36 under a claim initiated not earlier than November, 1903. This patent stated that it was "subject to the right of way and station grounds of the Minnesota and Manitoba Railroad Company under the Act of April 17, 1900," and a similar notation had been made on the original receipt issued on this entry. Material portions of the act referred to will be set forth later. One group of defendants claim under Harwood; the other under the townsite entry. Plaintiff claims under the act of April 17, 1900, and claims that its rights to the station grounds were initiated in 1900, and therefore are prior and paramount to those of defendants.

In 1899 plaintiff attempted to acquire a right of way across the ceded portion of the former Red Lake Indian Reservation under the Act of Congress of March 3, 1875, 18 St. 482, and under the Act of Congress of March 2, 1899, 30 St. 990, but the department of the interior ruled that neither of these acts applied to the ceded portion of this reservation and that no right of way across it could be acquired thereunder. This ruling was undoubtedly correct for these lands were not public lands, but were held by the United States in trust to be disposed of as provided in the Act of January 14, 1889, 25 St. 642, under which they were ceded by the Indians. Cathcart v. Minnesota & M. R. Co. 133 Minn. 14, 157 N. W. 719, and cases there cited.

After the rejection of the above applications, Congress, by a special act approved April 17, 1900, 31 St. 134, granted the desired right of way. This act states in the first section that

"There is hereby granted to the Minnesota and Manitoba Railroad Company, * * * the right of way of said railroad, with necessary side tracks and switch tracks * * * through the ceded lands of what was formerly the Red Lake Indian Reservation * * * which right of way shall be fifty feet in width on each side of the central line of said railroad."

This section also gave the company the right to take

"ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, turntables, water stations, and such other structures at such points as the said railroad company may deem to their interest to erect, not to exceed three hundred feet in width and three thousand feet in length for each station, to the extent of one station for each ten miles of road, except at the crossing of said Rainy River, at which point said railroad company may take not exceeding forty acres in addition to the grounds allowed for station purposes for the corresponding section of ten miles."

The second section of the act provides for ascertaining and paying the damages resulting to the Indians in their tribal capacity from the construction of the road, and then provides:

"No right of any kind shall vest in said railroad company in or to any part of the right of way herein provided for until plats thereof, made upon actual survey for the definite location of such railroad, and including grounds for station buildings, depots, machine shops, side tracks, turnouts, and water stations, shall have been approved. by the Secretary of the Interior, and until compensation aforesaid shall have been fixed and paid."

The third section of the act provides:

"That said company shall file maps showing the definite location of the line of road and station grounds in the local land office for the district in which the land lies, and upon approval thereof by the Secretary of the Interior the grant of right of way shown thereon shall relate back to the date of such filing."

Pursuant to this act plaintiff filed a map showing the definite location of its railroad from the eastern terminus of the road at the northern boundary of the state on Rainy river through the ceded portion of the reservation to the western terminus of the road on the northern boundary of the state west of the Lake of the Woods, and marked the station grounds in controversy on this map. This map was approved by the acting secretary of the interior on December 5, 1900, by an indorsement thereon in the following form:

"Approved subject to all the conditions, limitations and provisions of the Act of Congress of March 3, 1875 (18 Stat. 482), and of the Act of Congress of April 17, 1900 (31 Stat. 134), and subject also to all valid existing rights."

With its map of definite location, plaintiff also submitted a separate map of its station grounds at the crossing of the Rainy river showing that these station grounds consisted of the 300-foot strip 3,000 feet in length and the additional 40 acres which it was authorized to take at this point. This map was approved by the acting secretary at the same time that he approved the map of definite location and by an indorsement in the same form.

Pursuant to the Act of April 17, 1900, the department of the interior, in 1901, sent a special agent to appraise the damages which

would result to the Indians from the construction of the road. He appraised the damages for the right of way and made a separate appraisement of damages for taking 13.80 acres of land for station grounds at Roosevelt. These damages were paid by plaintiff and accepted by the department in 1901. The station grounds covered 20 acres, and how it happened that damages were appraised for only 13.80 acres does not appear. However the damages for the remainder were appraised and paid some years later. Plaintiff completed the construction of its railroad and began operating trains over it in 1901, about two years before any of the rights were initiated under which defendants claim.

The department of the interior adopted rules and regulations prescribing the procedure to be followed by railroads in acquiring a right of way, including station grounds, across public lands under the act of 1875. They are found in 27 L. D. 663. These regulations, among other things, required separate maps to be filed of station grounds drawn on a larger scale than the map locating the right of way. Although the right of way and the station grounds here in question were granted by the Act of April 17, 1900, and the Act of 1875 did not apply thereto, the department insisted that plaintiff should comply with the regulations adopted under the latter act so far as matters of form were concerned. For the purpose of complying with these requirements plaintiff filed a separate map of the station grounds at Roosevelt on December 29, 1905. This map was returned to plaintiff for correction, was subsequently refiled, and on February 3, 1909, was approved by the assistant secretary of the interior by an indorsement thereon in the same form as the indorsement on the map of definite location.

It is beyond question, and defendants concede, that if plaintiff's right to the station grounds was initiated by the filing of the map of definite location in 1900, plaintiff's title is prior and paramount to the title of the defendants, but defendants contend that plaintiff's claim dates only from the final filing of the separate map of these grounds which was approved in 1909, and that their rights are superior to those of plaintiff for the reason that the rights of those

under whom they claim attached long before this map was filed. They insist that the fact that plaintiff filed a separate map of its station grounds at Rainy river when it filed the map of definite location, indicates that plaintiff understood that separate maps must be filed for station grounds, but we deem this of no significance in view of the special provision for enlarged station grounds at that point. There was nothing in the special act granting the right of way and authorizing plaintiff to select station grounds which required the filing of separate maps of station grounds. The general act of 1875 did not apply to this land, and the requirements in respect to applications under that act did not necessarily apply to applications under this special act.

After plaintiff had filed its map of definite location, the department required certain changes to be made in the manner of authenticating it to make the authentication conform to the regulations under the Act of 1875, but no change was required or made in the map itself. When the requirements in respect to the indorsements and authenticating papers had been complied with, and on December 5, 1900, the map was approved. The approval contains nothing indicating an intention to exclude therefrom the station grounds designated on the map. So far as appears the approval applied to station grounds as well as to the right of way. In any event it certainly did not operate as a rejection of the selection for station grounds. The trial court found that the station grounds marked on the separate map approved on February 3, 1909, were the identical station grounds claimed by plaintiff on its map of definite location which was approved on December 5, 1900, and further found that this map had been properly noted on the records of the local land office on July 12, 1901, and further found that ever since 1901 extensive use has been made of a portion of these grounds in loading timber for transportation over plaintiff's road. The evidence fully warrants, and probably compels, these findings.

The grant to plaintiff was a grant in praesenti of lands to be thereafter identified. Stalker v. Oregon S. L. R. Co. 225 U. S. 142, 32 Sup. Ct. 636, 56 L. ed. 1027.

"As between conflicting claims to public lands, the one whose initiation is first in time, if adequately followed up, is to be deemed first in right." Svor v. Morris, 227 U. S. 524, 33 Sup. Ct. 385, 57 L. ed. 623.

By filing a map definitely locating the right of way of its railroad and indicating thereon the station grounds in question, plaintiff initiated a right thereto which, until disposed of, precluded the creation of a later superior right. Plaintiff's claim to these station grounds was never abandoned and never rejected. Plaintiff complied with the various requirements of the department including the filing of a separate map for these station grounds which was finally allowed and approved, but at all times plaintiff asserted the same identical claim to the same identical land, and, conceding that this claim was not established until the separate map was approved in 1909, such approval relates back to the filing of the original map in 1900, and plaintiff's rights to its station grounds are prior and paramount to the rights of the defendants. Stalker v. Oregon S. L. R. Co. 225 U. S. 142, 32 Sup. Ct. 636, 56 L. ed. 1027; Weyerhauser v. Hoyt, 219 U. S. 380, 31 Sup. Ct. 300, 55 L. ed. 258; Svor v. Morris, 227 U. S. 524, 33 Sup. Ct. 385, 57 L. ed. 623; Great Northern Ry. Co. v. Steinke, 261 U. S. 119, 43 Sup. Ct. 316, 67 L. ed. —, decided by U. S. Supreme Court February 29, 1923.

The instant case differs from the case of Stalker v. Oregon S. L. R. Co. supra, in the fact that the station grounds in question were indicated on the original map locating the right of way, and from the case of Great Northern Ry. Co. v. Steinke, supra, in the fact that it clearly appears that the identical grounds designated on the map finally approved had been selected and designated on the original map filed in 1900. Under the statute and the rule established by the authorities, plaintiff's right to the land in controversy was initiated by and dates from the filing of the original map. It follows that the decision of the learned trial court is correct and its order is affirmed.

On June 27, 1923, the following opinion was filed:

PER CURIAM.

After the appeal from the order denying a new trial had been taken in the above entitled case, a judgment therein was entered in the district court and an appeal was taken from this judgment. By agreement of the parties this appeal was submitted upon the record and briefs filed on the appeal from the order denying a new trial, and in accordance with the decision filed on that appeal the judgment is affirmed.